UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.M.,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>MARTIN J. O'MALLEY,<br><br>　　　　　Defendant. | Case No.  23-cv-03478-LJC<br><br>**ORDER RESOLVING SOCIAL SECURITY ACTION** |

## I. INTRODUCTION

Plaintiff S.M.[1] challenges the final decision of Defendant Martin O'Malley, Commissioner of Social Security (the Commissioner),[2] finding S.M. not disabled and thus ineligible for Supplemental Security Income benefits.  S.M. filed a brief on the merits in accordance with Rule 6 of the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g).  ECF No. 12.  The Commissioner filed a Cross-Motion for Summary Judgment under Civil Local Rule 16-5.  ECF No. 14.  Although that local rule no longer applies to cases that are governed by the Supplemental Rules, the Commissioner's Cross-Motion presents the issues in a manner substantively consistent with Supplemental Rule 7's requirement for a responsive brief, and the Court proceeds to resolve the case.

The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).  For the reasons discussed below, the matter is REMANDED for further

---

[1] Because opinions by the Court are more widely available than other filings, and this Order contains potentially sensitive medical information, this Order refers to the plaintiff only by her initials.  This Order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Martin O'Malley was sworn in as Commissioner of Social Security on December 20, 2023, and is therefore automatically substituted as the defendant in this case under Rule 25(d) of the Federal Rules of Civil Procedure.

1  administrative proceedings consistent with this Order, and the Clerk shall enter judgment in favor
2  of S.M.

## II.  BACKGROUND

### A.  Medical Records

For the convenience of the reader, this section provides a high-level summary of relevant portions of the record. This is not intended as a complete recitation of S.M.'s medical history or the administrative record.

S.M. suffers from multiple psychiatric impairments, including schizophrenia or schizoaffective disorder, major depressive disorder, generalized anxiety disorder, and borderline intellectual functioning. *See, e.g.*, Administrative Record (AR) (ECF No. 9)[3] at 744, 821, 866, 1161. She[4] has been hospitalized many times—including several involuntary holds under section 5150 of the California Welfare and Institutions Code and section 1799.111 of the California Health and Safety Code—for suicidal ideation, attempted suicide, and other psychiatric symptoms. Not all of S.M.'s hospitalizations are addressed in the Commissioner's decision or the parties' briefs, and although this Order discusses many of them, it is not a comprehensive list.

#### 1.  Pre-Application Hospitalizations

In May of 2017, S.M. spent three nights in a psychiatric hospital for suicidal ideation and a reported suicide attempt. *Id.* at 1913. Later that month, she spent around a week at the psychiatric hospital after police responded to a welfare check when she "felt like burning everything down," and she exhibited "marked negative symptoms of psychosis," "neurovegetative symptoms," and sporadic muteness. *Id.* at 1917–18. In mid-June of 2017, S.M. was brought to the hospital for suicidal ideation, discharged when she seemed to be feeling better, but then had her discharge

---

[3] This Order cites the administrative record using page numbers as marked by the Commissioner. Citations to other documents filed in the docket of this case refer to page numbers assigned by the Court's ECF filing system.

[4] Most of the administrative record indicates that S.M. uses "she" and "her" pronouns. Some medical records use masculine pronouns, possibly against S.M.'s wishes. Some medical records, as well as documents pertaining to previous applications, use a different name that S.M. has since changed to her current name. At least two records from 2018 indicate that S.M. preferred the gender-neutral pronoun "they," AR at 920, 1733, but S.M. uses female pronouns in her brief and in most of the record, and this Order follows that practice. If the Court is mistaken as to S.M.'s gender or pronoun usage, no offense is intended.

canceled when she "appeared confused and [was] unable to formulate a plan on how to return to [her] apartment using the bus," while "mute and [exhibiting] a blank stare." *Id.* at 1925–27. In July of 2017, S.M. was hospitalized for another three nights after ingesting 150 Benadryl pills. AR at 1658, 1875–76.

The next year, she was hospitalized for two days in early July of 2018 after reporting that she "want[ed] to take a knife and stab [her]self in the chest," and then refusing to speak with hospital staff and communicating only through hand signals. AR at 1706. She then spent another three nights in the hospital reporting plans to cut her wrist. *Id.* at 1881. She was again held as a danger to herself from July 12 through 20, 2018, reporting auditory hallucinations and presenting as nonsensical and delusional. *Id.* at 1055. Six days later, she was held at a hospital for a further two weeks until August 10, 2018 after presenting with severe auditory hallucinations. *Id.* at 744, 748. The day after being discharged, she presented to an emergency room for leg pain but exhibited a "clear psych disorder" and was not taking her medication. *Id.* at 1713. The day after that, S.M. was transferred to a psychiatric facility by ambulance from an emergency room, held for another two nights as a danger to herself, and discharged on August 14, 2018. *Id.* at 1886–93. She appears to have reported to the emergency room the same day she was discharged and then spent another night in the hospital, having presented as off of her psychiatric medication, hearing voices, and "trying to cut her hair out." *Id.* at 1716. A friend had found her in a locked room with scissors. *Id.* at 1719.

In October of 2018, S.M. was held in a locked acute hospitalization facility for around a week after again overdosing on medication while depressed and suicidal. *Id.* at 1982, 1984. A few days later, she was briefly held as a danger to herself at the emergency room when she reported a plan to jump in front of a train. *Id.* at 1721. Later in October, S.M. spent a night in the emergency room after she "was found in a parking lot . . . expressing suicidal ideation." *Id.* at 1733. In November of 2018, she visited the emergency room again for "vague" reports of suicidal ideation, *id.* at 1738, and later spent another four days on an involuntary hold in a psychiatric hospital due to suicidal ideation, *id.* at 1742–60. After release from that hospitalization, S.M. was immediately hospitalized again for another eleven days. *Id.* at 865. In December of 2018, S.M.

3

1    was hospitalized under section 5150 for twelve days "after endorsing [suicidal ideation] with plan
2    to [overdose], slit wrists, or burn self in context of medication non-adherence," and reports of a
3    recent suicide attempt. *Id.* at 920–21. Records from these hospitalizations frequently refer to
4    disordered thoughts and limited or confused speech, as well as reports of past or present drug use.

### 2. Application and Assessments

S.M. filed her present application for Supplemental Security Income benefits on December 4, 2018. *See* AR at 19. A previous application that S.M. filed in 2012 was denied by an administrative law judge (ALJ) in 2014. AR at 61–71. She filed another application in 2014, which another ALJ denied on August 24, 2017. *Id.* at 79–89.

In a January 2019 function report, S.M. asserted that she has "difficulty functioning" because her "mental state is not on par with others," and that she "deal[s] with daily trying to kill [her]self" and has been repeatedly hospitalized as a result. AR at 607. Her assessment of personal care reads in part: "My body stops me from moving when anxious. My mind gets in the way. Dressing is an issue because in my mind I'm anxious." *Id.* at 608. She reported that she sometimes needed people to tell her to shower. *Id.* at 609. She also reported difficulty with memory, completing tasks, concentration, understanding, following instructions, and getting along with others (among other categories) because her "mind controls [her] body," *id.* at 612, and that she sometimes has difficulty participating in social activities "because of [her] mind talking to [her]," as well as difficulty with her temper, *id.* at 611–12. She wrote that stress and changes to routine lead her to feel suicidal. *Id.* at 613.

A March 2019 psychological assessment indicates that S.M. received special education in high school and dropped out before graduating, and that she scored in the thirteenth percentile on the WAIS-IV test of intellectual functioning with a full-scale IQ of 83. AR at 1158, 1160. The psychologist concluded that S.M. was generally capable of normal functioning but would "perform academically at a level that is somewhat lower than same-aged peers." *See id.* at 1158–62.

Based on a review of S.M.'s application and medical records, two state agency consulting psychologists found in March and August of 2019 that S.M.'s abilities in various functional

4

categories ranged from no restrictions to moderate limitations. AR at 111–12 (Dr. Anguas-Keiter); *id.* at 125–27 (Dr. Brode).

On August 7, 2019, a Dr. Mortimer (who had treated S.M.) reported in an assessment form that S.M. had minimal physical limitations[5] but would be "[i]ncapable of even 'low stress' work" due to schizophrenia and auditory hallucinations, and that she would be absent from work more than four days per month. AR at 1241–43. Dr. Mortimer indicated that S.M. would spend more than twenty-five percent of a workday off task. *Id.* at 1243.

### 3. Post-Application Hospitalizations

S.M.'s psychiatric hospitalizations and other medical encounters continued after she submitted her present application. In October of 2019, she was brought voluntarily by ambulance to a crisis stabilization center, where she was confused, delusional, paranoid, and selectively mute, and exposed her breast to a staff member. AR at 1478–79.

In November of 2019, S.M. again reported to the emergency room "with thoughts of wanting to hurt herself" and a flat affect. AR at 1771, 1774. Later that month, she spent a night in the emergency room after overdosing on antidepressants. *Id.* at 1777. She was later held for four nights under section 5150. *Id.* at 1894. In December of 2019, she spent another night in the emergency room after overdosing on antipsychotic medication in a suicide attempt and then calling an ambulance. *Id.* at 1783. A treating physician characterized that visit as a "[s]uicide attempt by inadequate means." *Id.* at 1785. Later in December, she was held under section 5150 for three nights after another overdose attempt with multiple medications, *id.* at 1790, and then transferred to another psychiatric facility for more than two weeks, *id.* at 1903. She stared blankly at a doctor in response to questions and appeared to have feces on her hospital gown. *Id.* Soon after her admission to the psychiatric hospital, a nurse practitioner wrote:

---

[5] In some physical categories where the form did not provide a checkbox option for "no restrictions" or space for a narrative response, Dr. Mortimer checked the box for the least restrictive option. *E.g.*, AR at 1242 (checked boxes indicating that S.M. could sit, stand, and walk for "at least six hours"). It is not clear that Dr. Mortimer intended to assess any physical restrictions, although the ALJ apparently understood that form as having done so. AR at 30. That issue is not material to the Court's decision.

> Patient has a long history of mental illness. She has multiple suicide attempts by OD. Will hold off starting medications at this time. Will consider seroquel after patient metabolizes current OD. She exhibits significant thought blocking. Is a risk to self due to history of poor impulse control, suicide attempts and psychosis. Requires inpatient hospitalization for stabilization and safety.

*Id.* at 1911.

On January 17, 2020, the day after she was discharged from the psychiatric hospital, S.M. was held at the hospital for three nights again under section 5150 after she reported taking "a bunch of pills," even though she denied intent to harm herself on that visit and reported that she took the medication to help her sleep. *Id.* at 1823. In February of 2020, she reported to the emergency room with knee pain and nausea, but refused to stay despite a doctor's concern that she "still may have an emergent process." *Id.* at 1858. Later in February, she was hospitalized for several days after a suicide attempt by drug overdose. *Id.* at 1252.

On September 6, 2020, S.M. called the police and reported feeling suicidal and experiencing visual hallucinations, and was taken to the emergency room under section 5150, but exhibit normal behavior and affect. AR at 2129–31. September 2020 intake forms for a crisis recovery center reported that she was experiencing auditory hallucinations, paranoid thinking, thoughts of self harm, and psychosis. *Id.* at 1992–95. An October 2020 intake form from the crisis center indicated that she had been held at the hospital for suicidal ideation, but denied such intentions at the crisis center and claimed that the hospital staff who reported that were lying. *Id.* at 2108; *see also id.* at 2185 (hospital records). She claimed that she had not heard voices since five months earlier, but appeared to be responding to auditory hallucinations during her assessment. *Id.* at 2110. Emergency department records from around the same time indicated that she came in with complaints of suicidal ideation but denied such intent by the time of her interview. *Id.* at 2133–34.

In November of 2020, she spent a night at the emergency department and two nights at a psychiatric hospital after reporting plans to jump from a bridge or walk in front of a train. *Id.* at 2139, 2150. A note from that November 2020 hospitalization indicated that she "appear[ed] to be employing . . . verbiage to ensure admission and retention in the ED for the purposes of secondary gain of shelter and food, with the suspicion of metabolizing from ingested substances," and that

she had a history of doing so. AR at 2150. S.M. was hospitalized again for several days in December of 2020, during which time she "attempt[ed] to elope, but was brought back to bed by security" and "placed in restraints." *Id.* at 2297, 2301. She expressed both suicidal and homicidal ideation. *Id.* at 2302.

In January 2021, S.M. again presented to an emergency department with reports of suicidal ideation and auditory hallucinations, and appeared to be "responding to internal stimuli" during an examination. AR at 2170. The examining physician noted delusional and paranoid thoughts, and suspected psychosis. *Id.* at 2171. S.M. was transferred to a psychiatric hospital, *id.*, where she claimed that she had no mental illness and had been sent there due to a misunderstanding of reports about extreme pain in her legs, *id.* at 2191. She told the psychiatrist that she only needed help for homelessness. *Id.* at 2191–92. In February of 2021, she was brought to the hospital by ambulance after reporting that she swallowed forty Benadryl tablets. *Id.* at 2363. On April 11, 2021, she reported to the emergency department with thoughts of self-harm and asked for food, and a doctor noted that she had been "[s]een frequently in the ED for similar presentations." *Id.* at 2204. On April 16, 2021, she presented again with similar complaints, and said that she was no longer suicidal after eating a meal. *Id.* at 2209.

Later that month, however, she was found in distress at a gas station and reported that she had attempted to jump from a bridge, *see id.* at 2265, 2285, and she was held at the hospital for around three weeks after expressing suicidal ideation, exhibiting "very bizarre behavior," "responding to internal stimuli," and refusing medications to the point that the hospital obtained a court order to administer injections. *Id.* at 2223. S.M. only "[e]ventually" began to voluntarily comply with medications after injections were administered. *Id.* S.M. spent another night at an emergency department after requesting an ambulance for suicidal ideation soon after she was discharged in May. *Id.* at 2243, 2250, 2255.

In June of 2021, she told an emergency doctor that she had overdosed on methamphetamines and intended to shoot herself. *Id.* at 2421. In August, she presented to the emergency department with suicidal ideation and stated that she had ingested twenty-four Benadryl tablets. *Id.* at 2408.

7

On September 18, 2021, S.M. was brought to the hospital by ambulance for suicidal ideation. *Id.* at 2455. S.M. visited the emergency department on October 3, 2021, was discharged, and then "[i]mmediately . . . sliced her left wrist multiple times" and reported that she planned to jump of a bridge. *Id.* at 2447. In the very early morning of October 28, 2021, she was brought by ambulance to the emergency department when she exhibits "erratic behavior" at a BART station after using methamphetamine. *Id.* at 2438. Later the same morning (if timestamps on the medical records are accurate), she reported another Benadryl overdose (and asked for food), but a doctor was skeptical due to lack of symptoms. *Id.* at 2430, 2433.

Similar hospital visits continued later in 2021 and into 2022. *E.g.*, AR at 2475, 2521, 2573, 2597, 2623, 2632, 2650, 2659 2665, 2670, 2682, 2690. In a July 2022 incident, she was "brought in by ambulance secondary to being found screaming in the streets stating that she wanted to die and kill me." *Id.* at 2628.

Some of S.M's hospital visits have been for relatively routine matters like knee pain, while at others she presented with vague complaints. *E.g.*, AR at 1971 ("States, 'I don't feel well' but is unable or unwilling to offer additional information regarding what this means."). On a visit in April of 2022, she stated that "she just want[ed] some graham crackers and milk," *id.* at 2655, and in May, the emergency department let her stay for a few hours when she reported that she only needed a place to lie down, *id.* at 2639. One note from August 2022, when she visited the hospital for chest pain, indicated that she "wakes up but selectively closes eyes and avoids conversation." *Id.* at 2620.

Many of S.M.'s medical records refer to methamphetamine abuse. *E.g.*, AR at 1186–87, 1722. Some records indicate a history of using heroin, benzodiazepine, cannabis, MDMA, and alcohol. *E.g.*, *id.* at 744, 2151. Some hospital admission records nevertheless reflect a negative toxicology screen for amphetamines and other recreational drugs. *E.g.*, *id.* at 1258, 2180, 2309.

Some medical notes state that S.M. was malingering for the purpose of obtaining food and shelter or had a history of doing so. *Id.* at 1397, 2489, 2491, 2497, 2657, 2661, 2682, 2693. On one occasion, an emergency doctor who noted S.M.'s history of malingering offered her food, fluids, and a bed to sleep in, but she "declined stating that she just wants to hurt herself." *Id.* at

8

2682–84.

### B.     Administrative Hearing

S.M.'s present application was denied initially and again on reconsideration, and she submitted a request on August 22, 2019 for a hearing before an ALJ. *See* AR at 19. After five continuances due at least in part to difficulty contacting S.M., the ALJ held a hearing more than two years later on September 20, 2022. *Id.* at 48. S.M. did not appear. *See id.* Her attorney stated that he had been unable to reach S.M. for some time using any of the phone numbers and email addresses that he had on file for her, and that he had attempted public records searches for additional contact information without success. *Id.* at 49. The attorney stated that he was in contact with S.M.'s mother, who reported that S.M. was living on the street. *Id.* at 50. In light of the many previous continuances, the ALJ proceeded with the hearing in S.M.'s absence, and S.M.'s attorney confirmed that he did not object to the ALJ doing so. *Id.* at 51.

S.M.'s attorney argued that she should be found disabled based on meeting a listing for a psychiatric impairment—an argument S.M. has not pursued here—and also because restrictions including off-task behavior, difficulty working with others, and absenteeism would prevent her from working. AR at 53.

The ALJ noted that S.M. had no past relevant work experience and had not graduated from high school, but that she was not placed in special education[6] and was able to read and write. AR at 54. The ALJ asked a vocational expert (the VE) whether work would be available if such a person had no exertional limitations but had the following non-exertional restrictions:

> Would be limited to performing simple, routine tasks that did not involve com complex decision making or judgment.
>
> Could tolerate occasional workplace changes, but no production rate pace or quarter [sic] requirements such as required by assembly line work. The individual would be able to complete quotas by the end of the day.
>
> The individual could have only occasional contact with coworkers and supervisors and incidental contact with the general public.

---

[6] This contradicts a psychologist's report indicating that S.M. was a "slow learner" and "received special education services in school." AR at 1158.

9

AR at 54–55.  The VE testified that a person with those restrictions could work as a scrap sorter, laundry worker, or rack room worker, with a total of over 300,000 jobs nationwide across those three categories.  *Id.* at 55.

The ALJ asked if an added restriction of being off task due to concentration difficulties would affect the availability of work, and the VE testified that maintaining employment would require "not more than 10 percent off task during the eight-hour workday, and that has to be taken over the workday, not all at one time."  AR at 55.  When the ALJ asked about the effect of absenteeism or inability to maintain regular working hours due to mental health impairments, the VE testified that an employee could not be absent, arrive late, or leave early more than one day per month and still retain work.  *Id.* at 55–56.

S.M.'s attorney stated that he had no questions for the VE because the ALJ covered everything that he had intended to ask.  AR at 56.  The ALJ ended the hearing.  *Id.* at 56–57.

### C. Legal Standard for Administrative Proceedings

The Social Security Administration uses a five-step process to determine whether claimants are entitled to disability benefits:

> Step 1. Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "*not disabled*" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).
>
> Step 2. Is the claimant's impairment severe? If not, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).
>
> Step 3. Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "*disabled*" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).
>
> Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "*not disabled*" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at

> step four and the evaluation proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(e).
>
> Step 5. Is the claimant able to do any other work? If not, then the claimant is "*disabled*" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "*not disabled*" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "*disabled*" and therefore entitled to disability benefits. *See id.*

*Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999) (footnote omitted); *see also Maxwell v. Saul*, 971 F.3d 1128, 1130 n.2 (2020).[7]  "At steps one through four, the claimant retains the burden of proof; at step five, the burden shifts to the Commissioner." *Maxwell*, 971 F.3d at 1130 n.2.

For Step 3 of the analysis, all listed impairments related to mental health or functioning incorporate a test of whether a claimant has either "extreme" limitations in one category, or "marked" limitations in two categories, with respect to a claimant's abilities to: (1) "Understand, remember, or apply information"; (2) "Interact with others"; (3) "Concentrate, persist, or maintain pace"; and (4) "Adapt or manage oneself."  These standards are often referenced as the "paragraph B criteria."  *See* Listing 12.00(A)(2).  For some listings, that standard can be substituted by a claimant showing that they meet separate "paragraph C criteria" or other listing-specific standards. *Id.*; *see also* Listing 12.05(A).

**D.     The ALJ's Decision**

The ALJ began her analysis by noting that S.M. had been found not to be disabled on a previous application, but she concluded that a presumption of non-disability did not apply due to "new and material evidence, such as a diagnosis of schizoaffective disorder." AR at 19.

---

[7] The regulatory citations in this passage apply to adjudication of Disability Insurance benefits and refer to an earlier version of 20 C.F.R. § 404.1520 that is substantially similar to the current language of that regulation.  20 C.F.R. § 416.920 sets forth materially identical steps to assess disability for the purpose of Supplemental Security Income benefits, which are at issue in this case.

11

At Step 1, the ALJ determined that S.M. had not engaged in substantial gainful activity since her December 4, 2018 application date. AR at 21.

At Step 2, the ALJ identified the following severe impairments: "schizoaffective disorder, major depressive disorder, generalized anxiety disorder, borderline intellectual functioning, and methamphetamine abuse." AR at 22. The ALJ determined that S.M.'s obesity (which occurred only sometimes; her weight fluctuated), her cannabis use disorder, and an unspecified sexual dysfunction were not severe impairments, *id.*, and S.M. does not challenge that conclusion here.

At Step 3, the ALJ considered Listings 12.03 (Schizophrenia spectrum and other psychotic disorders), 12.04 (Depressive, bipolar and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), and 12.11 (Neurodevelopmental disorders). AR at 22. The ALJ found that S.M. did not satisfy the paragraph B criteria, which are shared by all of those listings, because she had only moderate limitations in each of the four functional categories. *Id.* at 22–24. The ALJ also found that S.M. did not satisfy the alternative paragraph C criteria. *Id.* at 24.

The ALJ assessed the following residual functional capacity (RFC) for the purpose of evaluating Steps 4 and 5:

> the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is limited to simple routine tasks not involving complex decision-making or judgment. The claimant could tolerate occasional workplace changes but no production rate pace or quota requirements such as required with assembly line work. The claimant is able to complete quotas by the end of the day. The individual could have occasional contact with coworkers and supervisors and incidental contact with the general public.

AR at 24. That RFC reflected the first hypothetical that the ALJ posed to the VE at the hearing. *See id.* at 54–55. It did not include the restrictions as to time on task, tardiness, or regular attendance that the ALJ posed to the VE after that. *See id.* at 55–56.

In explaining that RFC, the ALJ summarized medical records including S.M.'s repeated hospital admissions, prescriptions, occasional improvement on medication, noncompliance with medication, drug use, and various tests and reported symptoms. AR at 25–27.

The ALJ found the medical record "inconsistent" or "somewhat inconsistent" with her "statements concerning the intensity, persistence, and limiting effects of her symptoms, citing

12

inconsistent mental status examinations and improvement with treatment. AR at 28. To support that conclusion, the ALJ noted some records indicating that she "exhibited a history of malingering" or "expressly stated that [she] demonstrated malingering behavior." *Id.* at 28; *see also id.* at 27. The ALJ stated that S.M. sometimes went to the emergency room seeking food or a place to rest, that she "often presented as selectively non responsive," and that her "suicidal ideations at times were vague" and she sometimes denied them later. *Id.* at 28. In partially rejecting S.M.'s asserted symptoms, the ALJ also noted that S.M. had "a substantial history of methamphetamine abuse" and was not compliant with treatment. *Id.* The ALJ concluded that such factors were "[c]ollectively . . . somewhat inconsistent" with her reported severity of symptoms. *Id.*

The ALJ found that state agency consulting doctors who assessed no restrictions to moderate limitations in various categories of functioning were partially persuasive, but she determined that they erred in failing to recognize moderate limitations in adapting and managing due to S.M.'s "difficulty following prescribed treatment." *Id.* at 29. The ALJ found the consultative examiner Dr. Swanson's conclusions only somewhat persuasive because he did not have access to S.M.'s medical records and did not sufficiently account for how her mental health symptoms would affect her ability to interact with the general public. *Id.* at 30.

The ALJ found Dr. Mortimer's opinion that S.M. was incapable of work unpersuasive. AR at 30. According to the ALJ, that opinion was inconsistent with evidence indicating "non-compliance with prescribed medical treatment" and that S.M.'s "mental health improved when following prescribed treatment." *Id.* The ALJ also noted that Dr. Mortimer "did not consider the history of methamphetamine use . . . or tendency toward malingering," and lacked access to the complete medical record. *Id.*[8]

The ALJ also found a case manager's opinions unpersuasive. AR at 30–31.

The ALJ determined that S.M. had no past relevant work, thus implicitly finding at Step 4

---

[8] As noted in an earlier footnote, the ALJ apparently construed Dr. Mortimer's report as assessing physical limitations, and rejected those for lack of evidence. AR at 30. It is not clear that Dr. Mortimer intended to assess physical limitations, and that issue does not affect the Court's decision.

13

1    that she could not perform any past work.  AR at 31.  At Step 5, the ALJ found that S.M. could

2    perform other work available in the national economy, based on the VE's testimony that someone

3    with the RFC assessed by the ALJ could work as a sorter, laundry worker, or rack room worker.

4    AR at 32.  The ALJ therefore found that S.M. was not disabled.

5           The Appeals Council found no basis to review the ALJ's decision, thus making it the final

6    decision of the Commissioner.  AR at 1–3.

### E. The Parties' Arguments

8           S.M. contends that the ALJ erred in failing to account for the VE's testimony that regular

9    absenteeism would result in no jobs available.  ECF No. 12 at 21–23.  Although the ALJ's RFC

10   did not include absence from work, S.M. argues that her frequent involuntary holds and hospital

11   admissions show that she would not have been able to attend work regularly.  *Id.* at 23–25.  S.M.

12   also argues that the ALJ was required to provide clear and convincing reasons to reject her

13   statements regarding the severity of her symptoms, and that the ALJ failed to do so.  *Id.* at 25–29.

14   In S.M.'s view, the ALJ failed to consider whether her noncompliance with medication was

15   caused by her mental impairments, improperly relied on isolated instances of malingering (which

16   were motivated by S.M.'s homelessness and indigency) to discount psychiatric hospitalizations

17   where there was no indication of malingering, and placed undue weight on occasional drug use

18   without specifically finding substance use material to S.M.'s potential disability.  *Id.* at 27–28.

19   S.M. requests remand for further proceedings including a new hearing.  *Id.* at 29.  She does not

20   seek a determination by this Court that she is disabled.  *See id.*

21          The Commissioner argues that the "clear and convincing" standard for rejecting symptom

22   testimony does not apply where, as here, an ALJ finds that a claimant was malingering.  ECF No.

23   14 at 3–4.  The Commissioner further contends that the ALJ properly relied on evidence showing

24   improvement with treatment (including in structured settings), and that the "ALJ may reject a

25   claimant's symptom allegations by pointing to an unexplained or inadequately explained failure to

26   follow a prescribed course of treatment, absent medical evidence that the failure to seek or follow

27   treatment was attributable to claimant's mental impairment rather than her personal preference." *Id.* at

28   4–5 (citing *Molina v. Astrue*, 674 F.3d 1104, 1113–14 (9th Cir. 2012).  The Commissioner also asserts

14

that S.M.'s allegations of memory problems were inconsistent with Dr. Swanson's findings. *Id.* at 6. The Commissioner concludes by arguing that the Court should not accept S.M.'s characterization of the medical evidence in place of the ALJ's, and that the ALJ's RFC (with no finding of absenteeism) was supported by substantial evidence including S.M.'s record of malingering. *Id.* at 6–9.

S.M. did not file a reply as allowed by Supplemental Rule 8.

### III. ANALYSIS

#### A. Legal Standard

In cases challenging the denial of disability benefits, district courts have authority to review and "affirm[], modify[], or revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "An ALJ's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence," which "'means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). A court must consider evidence both supporting and detracting from the Commissioner's decision; if the evidence could reasonably support either outcome, the court may not substitute its judgment for that of the ALJ. *Id.* at 1010. Courts "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Id.*

#### B. The ALJ Erred in Addressing Noncompliance with Treatment

The Ninth Circuit has cautioned that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Garrison*, 759 F.3d at 1018 n.24 (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)).

If there is no evidence that a claimant's "resistance was attributable to her mental impairment rather than her own personal preference," then an ALJ can consider lack of treatment as a factor undermining a claimant's reported severity of symptoms. *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012). But "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental

15

1  impairment itself and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v.*
2  *Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (cleaned up).  In other words, "a failure to seek
3  treatment or take prescribed medication may often be indicative of a more severe mental
4  impairment." *A.S. v. Saul*, No. 20-cv-00281-JCS, 2021 WL 1087473, at *18 (N.D. Cal. Mar. 22,
5  2021) (citing *Nguyen*, 100 F.3d at 1465).  The Social Security Administration's own rulings reflect
6  that "mental impairments that affect judgment, reality testing, or orientation" may limit
7  understanding of appropriate treatment.  Social Security Ruling (SSR)[9] 16-3p, 2017 WL 5180304,
8  at *10 (Oct. 25, 2017).

9      In keeping with those principles, SSR 18-3p (which was not mentioned by the ALJ or
10 either party) requires the Commissioner to consider the *reason* a claimant failed to follow
11 prescribed treatment, and to excuse such failure if it was due to incapacity or other "reasonably
12 justified" reasons establishing good cause.  SSR 18-3p, § C, 2018 WL 4945641, at *4–6 (Oct. 2,
13 2018).

14     If the ALJ had determined that S.M. failed to take her prescribed medication of her own
15 volition, for reasons unrelated to her impairments and without good cause, the Court's task would
16 be to decide whether substantial evidence could support that determination on this administrative
17 record.  But the ALJ made no such determination.

18     In at least some contexts, the ALJ treated S.M.'s failure to follow prescribed treatment as a
19 consequence of her impairments.  Two state agency psychologists (Dr. Brode and Dr. Anguas-
20 Keiter) assessed mild limitations in S.M.'s ability to adapt or manage herself, but the ALJ
21 determined in her discussion of S.M.'s RFC that, "given the claimant's difficulty following
22 prescribed treatment, [those doctors] should have imposed a moderate limitation regarding
23 adapting or managing oneself." AR at 29.  Similarly, the ALJ found at Step 3 that S.M.'s
24 moderate level of limitations in interacting with others was supported by her "difficulty following

---

[9] SSRs are official interpretations of law and regulation issued by the Social Security Administration.  Although they do not have the force of law, they are binding on ALJs and entitled to some deference from courts, and an ALJ's failure to comply with an SSR can constitute error requiring remand under at least some circumstances.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1229 (9th Cir. 2009); *Avenetti v. Barnhart*, 456 F.3d 1122, 1124 (9th Cir. 2006); *Quang Van Han v. Bowen*, 882 F.2d 1453, 1457 n.6 (9th Cir. 1989).

the direction of treating medical professionals," citing the same portions of the record. AR at 23. The ALJ also characterized "impaired judgment" and "uncooperative attitude" as among S.M.'s mental impairment symptoms, and acknowledged that a "treating physician noted [S.M.'s] poor coping skills and medication non-compliance as limitations," *id.* at 25.[10]

In other contexts, however, the ALJ used that same failure to follow treatment as a reason to *set aside* evidence of severe psychiatric limitations. In the Step 3 analysis of S.M.'s ability to adapt and manager herself, the ALJ treated S.M.'s "non-compliance with prescribed medical treatment" and the fact that her "mental health improved when following prescribed treatment" as grounds to discount the effects of her diagnosed conditions and her reports of "daily suicidal ideation" and "difficulty getting dressed." AR at 23–24. In the context of S.M.'s RFC, the ALJ cited S.M.'s noncompliance as "somewhat inconsistent with [her] statements about . . . her symptoms," and found treating physician Dr. Mortimer's opinion that S.M. could not perform any work due to schizophrenia "inconsistent with and unsupported by the medical evidence" showing S.M's failure to take medication that improved her condition. *Id.* at 30. Those portions of the ALJ's decision cited the very same medical records as the portions discussed above that characterized her difficulty following medical directives as a component of her impairments.

The ALJ did not specifically explain why she did not include some degree of absenteeism in S.M.'s RFC to reflect S.M.'s frequent psychiatric hospitalizations, many of which included involuntary holds under state law. Reading the ALJ's decision as a whole, she appears to have concluded that some hospitalizations resulted from malingering and were not medically necessary, while others resulted from genuinely severe psychiatric symptoms due to noncompliance with medication. At the very least, the ALJ acknowledged that S.M.'s symptoms worsened when she did not take her medication, to a degree that would seem to interfere significantly with her ability

---

[10] The record also includes other instances not addressed by the ALJ where S.M.'s impairments contributed to her failure to take medication, as evidenced by increased willingness to continue taking medication after acute symptoms subsided. For example, during S.M.'s extended psychiatric hospitalization in the spring of 2021, she initially refused to comply with prescribed medication, and the hospital obtained a court order and administered antipsychotic injections against her will. *Id.* at 1223. Once that medication helped to reduce her psychosis, she voluntarily complied with other medication, at least for a time. *Id.*

17

to work. AR at 26–27 ("September 2020 treatment records illustrated ongoing non-compliance concerning taking prescribed medication. Consequently, her mental impairment symptoms, such as impaired judgment, uncooperative attitude, auditory hallucination, and grandiose thought content, worsened."). There is likely at least substantial evidence to support a conclusion that some of S.M.'s hospital visits were based on malingering, given the conclusions of treating doctors to that effect, *e.g.*, *id.* at 2657, even if such malingering might be understandable in light of S.M.'s homelessness and indigency. But there is not substantial evidence that *all* of S.M.'s hospitalizations arose from malingering, and the ALJ did not reach that conclusion.

Many of S.M.'s hospitalizations resulted from serious psychological symptoms where the medical records do not include any indication of malingering. *E.g.*, AR at 1719 (noting that a friend at S.M.'s bedside found S.M. in a locked room with scissors "trying [to] cut her hair out," and that S.M. was hearing voices and exhibiting bizarre behavior); 1903 (noting feces on S.M.'s hospital gown during a multiple-week hospitalization); *id.* at 2223, 2265, 2285 (indicating that S.M. was hospitalized for around three weeks after she was found in distress at a gas station, and required involuntary medication before she showed improvement); *id.* at 2301 (noting that S.M. was held in restraints after she attempted to leave the hospital); *id.* at 2628 ("Per 5150 brought in by ambulance secondary to being found screaming in the streets stating that she wanted to die and to kill me."); *see also id.* at 1713 (noting a "clear psych disorder" even when S.M. only complained of leg discomfort).[11] The ALJ appears to have discounted those hospitalizations as the effects of noncompliance with medication. Before doing so, however, the ALJ needed to consider why S.M. had failed to take her medication, *see* SSR 18-3p, § C, particularly because the ALJ separately recognized that S.M.'s impairments at least contributed to her noncompliance.

Moreover, as acknowledged in both the ALJ's decision and the Commissioner's brief, much of S.M.'s documented improvement occurred when she "was in a structured environment." ECF No. 14 at 4 (quoting AR at 28). When S.M. was hospitalized for an extended period in April and May of 2021, for example, she did not show improvement and agree to take medication until

---

[11] These examples are not intended to be comprehensive.

18

after the hospital injected her with medication against her will pursuant to a court order. AR at 2223. Although not addressed by either party, the Social Security Administration's listings and other regulations require the Commissioner to consider "the kind and extent of supports or supervision" that "enable [a claimant] to function," and to assess greater limitations where a claimant needs "more extensive . . . support" or a "more structured setting . . . in order to function." Listing 12.00(F)(3)(e); *see also* 20 C.F.R. § 404.1520a (requiring consideration of "how [a claimant's] functioning may be affected by factors including . . . structured settings"). "Intermittent improvement . . . limited to structured settings is particularly suspect as evidence that a claimant can work outside of such settings." *Clark v. Berryhill*, No. 17-cv-00371-JCS, 2018 WL 3659052, at *29 (N.D. Cal. Aug. 2, 2018).

The ALJ therefore erred in citing medication noncompliance to set aside both opinion evidence (including that of Dr. Mortimer) and the practical impact of S.M.'s frequent hospitalizations without first considering whether such noncompliance was an excusable effect of S.M.'s impairments and whether S.M. requires a structured setting to adhere to medication and otherwise function sufficiently.

### C. Substance Use

The ALJ referred to S.M.'s use of methamphetamine as potentially "inconsistent" with her reported symptoms, AR at 28, and as a factor purportedly not considered by Dr. Mortimer in assessing an inability to work, *id.* at 30. In doing so, the ALJ may have treated the effects of S.M.'s drug use as distinct from her other mental health impairments, and as irrelevant to the question of whether she is disabled.

The Social Security Administration has acknowledged in SSR 13-2p that mental impairments are often intertwined with drug and alcohol use, and that "[w]e do not know of any research data that we can use to predict reliably that any given claimant's co-occurring mental disorder would improve, or the extent to which it would improve, if the claimant were to stop using drugs or alcohol." SSR 13-2p, 2013 WL 621536, at *9 (Feb. 20, 2013). For cases involving mental impairments as well as substance use, SSR 13-2p therefore requires the Commissioner to first determine whether the claimant would be disabled if the effects of continued drug and alcohol

19

use are taken into account, and only then decide whether those effects can be isolated (typically by comparing a period of abstinence) and whether the claimant would still be disabled without them. *See id.*; *B.D. v. Kijakazi*, No. 21-cv-04493-JCS, 2022 WL 4793385, at *8–10 (N.D. Cal. Sept. 30, 2022); *see also* SSR 13-2p, 2013 WL 621536, at *12–13 (addressing consideration of substance use and co-occurring mental disorders when the record only demonstrates improved functioning in a "highly structured treatment setting"). The ALJ did not follow that process here.

The ALJ appears to have placed at least some weight on S.M.'s drug use in finding that she was not disabled, but it is not entirely clear how the ALJ treated that issue. Because remand is necessary to resolve the error discussed above regarding S.M.'s noncompliance with medication, the Court does not reach the question of whether the ALJ's failure to follow or discuss SSR 13-2p alone would be grounds for reversal. On remand, however, the ALJ should more clearly address the effects of S.M.'s methamphetamine use if the ALJ considers that issue relevant to the determination of disability.

## IV. CONCLUSION

The ALJ erred at least in disregarding hospitalizations and other symptoms caused by S.M.'s noncompliance with medication without considering the reasons for her noncompliance, particularly given that the ALJ seems to have acknowledged that S.M.'s impairments contributed to her noncompliance. The ALJ also may have erred in her consideration of S.M.'s drug use. The case is therefore REMANDED for further proceedings consistent with this Order, and the Clerk shall enter judgment in favor of S.M.

The Court does not reach the parties' remaining arguments, which the Commissioner is encouraged to consider on remand.

**IT IS SO ORDERED.**

Dated: September 25, 2024

LISA J. CISNEROS
United States Magistrate Judge

20